DAMIAN WILLIAMS
United States Attorney
Southern District of New York
By:     CHARLES S. JACOB
        NATASHA W. TELEANU
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No. (212) 637-2725/2528
Fax No. (212) 637-2786
*Attorney for the United States of America*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

TOWN/VILLAGE OF HARRISON, NEW YORK; FIRE
DISTRICT TWO OF HARRISON, NEW YORK; HARRISON
VOLUNTEER FIRE DEPARTMENT NO. 1 OF
HARRISON, N.Y. d/b/a HARRISON FIRE DEPARTMENT,

        Defendants.

**JURY TRIAL
DEMANDED**


**COMPLAINT**


22 Civ. 4778

---

**COMPLAINT**

      Plaintiff the United States of America ("United States"), by and through its attorney

Damian Williams, United States Attorney for the Southern District of New York, alleges as

follows:

**INTRODUCTION**

      1.      The United States brings this action against the Town/Village of Harrison, one of

its Fire Districts, and the Harrison Fire Department, to enforce Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq*., as amended.

1

2.      In 2015, Angela Bommarito joined Harrison's Fire Department. In her first month on the job, a senior firefighter—Henry Mohr—pressured Bommarito with unwanted sexual advances. Bommarito initially declined Mohr's attempts, but later entered into a sexual relationship with him. A few months in, Bommarito tried to end it. In response, Mohr stalked Bommarito, harassed her, and called her a "whore" and "bitch" in front of other firefighters.

3.      Bommarito reported Mohr's harassment and stalking to the Fire Department and Harrison. But no one conducted any adequate investigation of Bommarito's complaints. Indeed, one Fire Department supervisor told Bommarito that if she sought an order of protection against Mohr, it was Bommarito who would have to leave the Fire Department, not Mohr. That proved prescient.

4.      Because Mohr's stalking and harassment continued, Bommarito filed a complaint against Mohr with the Harrison Police Department. After reviewing the evidence, the then-Police Chief told Mohr, in sum and substance, that the Town of Harrison had sufficient evidence to pursue discipline against him based on sexual harassment. To avoid that, the Police Chief devised a plan where, in his own words, he would "broker a deal with the Town to make sure this whole thing dies." In an interaction that was recorded, the Police Chief explained how he intended to get a "guarantee" from the leadership of Harrison that there would be no discipline or adverse action taken against Mohr. He did just that.

5.      As captured on video, the Police Chief coerced Bommarito to resign from the Fire Department by intimating that that he could arrest her and reveal her other alleged sexual relationships to the leadership of Harrison. At that meeting, Bommarito, visibly distressed, signed a resignation letter that the Police Chief wrote and put in front of her. Within days,

Bommarito attempted to withdraw this resignation. Harrison leadership, however, processed her resignation anyway.

6. Moreover, despite receiving multiple complaints about Mohr's harassment of Bommarito, Harrison leadership permitted Mohr to remain a firefighter and took no disciplinary action against him. At the then-Police Chief's suggestion, Mohr voluntarily stepped down from his newly elected role as Fire Chief under the misleading guise of family issues, but remained, and still remains, a firefighter.

7. Even after Bommarito left the Fire Department, Mohr continued to stalk and harass her. He was eventually arrested and prosecuted for his actions, and pled guilty to harassment in the second degree. A family court also entered an order of protection against him on Bommarito's behalf. Nevertheless, Mohr remains an active firefighter to this day.

## JURISDICTION AND VENUE

8. This Court has jurisdiction of this action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1345.

9. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1395 because the violations alleged in this complaint arose in the Southern District of New York and because Harrison, the Fire Department, and the Fire District are located in this district.

10. Angela Bommarito lives within this juridical district in Harrison, New York.

## THE PARTIES

11. Plaintiff is the United States.

12. Defendant Town/Village of Harrison ("Harrison") is a co-terminus town/village, duly chartered under the laws of the State of New York, located in Westchester County, New York. Harrison employs over 350 individuals.

3

13.     Defendant Fire District Number Two of Harrison, New York (the "Fire District") is a political subdivision organized pursuant to the laws of the State of New York, and is located in Westchester County, New York. Together with the Fire Department, the Fire District employs over 50 uniformed firefighters in Harrison to provide firefighting services to its residents.

14.     Harrison Volunteer Fire Department No. 1 of Harrison, N.Y. (the "Fire Department") is located in Westchester County, New York. The Fire Department provides firefighting services to the Fire District's residents under color of law and pursuant to legal authority granted to the Fire Department by the Fire District and the laws of the State of New York. The Fire Department holds itself out to the public as the "Harrison Fire Department." Together with the Fire District, the Fire Department employs over 50 uniformed firefighters in Harrison to provide firefighting services to its residents.

15.     Each Defendant is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

**EEOC CHARGE**

16.     Bommarito filed a timely charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on September 21, 2016, against, among other parties, Harrison and the Fire Department (Charge No. 520-2017-00490), alleging that she was subjected to gender discrimination, sexual harassment, and retaliation. Pursuant to 42 U.S.C. § 2000e-5, the EEOC investigated the charge, found reasonable cause to believe that Bommarito was discriminated against on account of her sex and retaliated against following her internal complaints. The EEOC attempted unsuccessfully to achieve through conciliation a voluntary

resolution of the charge, and subsequently referred the matter to the United States Department of Justice.

17.    The United States now brings this action pursuant to 42 U.S.C. § 2000e-5(f) to enforce the provisions of Title VII.

18.    All conditions precedent to the filing of suit have been performed or have occurred.

## FACTUAL BACKGROUND

### *The Harrison Fire District and Fire Department*

19.    Harrison contains five fire districts. Under New York State law, fire districts are political subdivisions that are administrated by each respective fire district's Board of Commissioners. *See* N.Y. Town Law § 170.

20.    Harrison's second fire district is the Fire District (as defined in this Complaint). Harrison's downtown area is within the Fire District's borders. The Fire District has elected to maintain its own fire department—the Fire Department, as defined in this Complaint—to provide firefighting services to the Fire District's residents.

21.    Harrison's Town Board appoints five individuals to the Fire District's Board of Commissioners (the "Fire Commissioners") to, among other things, administer and direct the Fire Department in the discharge of its duties. In 2015, the Fire Commissioners were comprised of the Harrison Mayor and four elected members of the Harrison Town Board.

22.    The Fire Department's membership is comprised of a mix of salaried personnel and personnel that does not receive any annual salary. At or around the time that Bommarito joined the Fire Department, approximately 15 individuals who performed services for the Fire Department received an annual salary, while approximately 65 individuals did not receive an

annual salary.

23.     Non-salaried firefighters hold the Fire Department's leadership positions. Each year, the Fire Department elects non-salaried firefighters for leadership positions, including a chief, first assistant chief, and second assistant chief. The Fire Commissioners have the authority to reject the selection of any elected officer of the Fire Department, and to require the Fire Department to hold a new election.

24.     At all times relevant to these allegations, non-salaried Fire Department firefighters, including Bommarito, received remuneration from the Defendants in exchange for their services. Such remuneration included: (1) life insurance; (2) disability benefits; and (3) college tuition assistance.

25.     In 2015, the Fire Department did not require employees to take any courses relating to sexual discrimination or sexual harassment.

### *Bommarito's Tenure as a Harrison Firefighter*

26.     Bommarito applied to join the Fire Department in May 2015. At the time that Bommarito applied to the Fire Department, the Fire Department had no active female firefighters. In June 2015, the Fire Department accepted Bommarito's application and she joined the Fire Department, together with one other female non-salaried firefighter.

27.     As a member of the Fire Department, Bommarito took classes, attended drills, and participated in fire calls. Bommarito's performance as a firefighter at the Fire Department exceeded expectations for a firefighter of her tenure and experience. Among other things, Bommarito: (1) was quick to react without direction; (2) worked hard; (3) did not show nerves; and (4) appropriately followed directions from superiors. Other firefighters at the Fire Department provided Bommarito with positive reviews of her work performance.

28.     While working as a non-salaried firefighter, Bommarito also participated in training programs. In January 2016, Bommarito qualified as a licensed interior-structural New York State firefighter. This certification permits an individual to fight fires inside buildings. To obtain this qualification and certification, Bommarito attended over 100 hours of training classes and passed the requisite testing, including a final examination, during her tenure as a Harrison non-salaried firefighter.

### *Bommarito's Working and Personal Relationship with Mohr*

29.     Soon after Bommarito joined the Fire Department, however, she had second thoughts about her decision to join, particularly in light of the Fire Department's lack of female representation. But other firefighters within the Fire Department reassured Bommarito regarding her concerns.

30.     For example, one fellow firefighter—a former Chief of the Fire Department—told Bommarito that she should consider Henry Mohr to be an informal mentor.

31.     Mohr has been a non-salaried firefighter at the Fire Department for over twenty years, and in 2015, held a full-time position at the Harrison Department of Public Works. Mohr served as the Fire Department Chief from 2005-2006 and 2008-2009. In 2015, Mohr maintained significant influence within the Fire Department, as a result of his tenure and long-lasting relationships with the Fire Department's commanding officers. In addition, as a senior member, Mohr assumed the commanding officer role in instances where a more-senior member was not present at a fire call—including on occasions when Mohr drove the fire engine with Bommarito on board.

32.     In or about June 2015, a firefighter involved with recruiting provided Mohr with Bommarito's cell phone number so they could speak. During a subsequent conversation, Mohr

7

told Bommarito, in sum and substance, that there would be no issues with her fitting in to the Fire Department, despite Bommarito's gender.

33.    This conversation with Mohr was one reason that Bommarito did not quit the Fire Department.

34.    In June 2015, Bommarito attended an annual social event put on by the Fire Department, known as the Fireman's Ball. While at the Fireman's Ball, Mohr sent a text message to Bommarito, which resulted in the following exchange:

Mohr: U look good [. . .] wow

Bommarito: thank you

Mohr: Are u getting mad because I'm saying that

Bommarito: no. not at all. it's a compliment

Mohr: I like what I see

Bommarito: As long as you mean well, we are good . . .

Mohr: What's that mean

Bommarito: it means compliments are ok. But we both have to be professional. Nothing towards you at all. just want to do things right being apart of the department.

Mohr: Know would know anyway

Bommarito: Too much talking in this department. Don't want anyone getting the wrong impression.

Mohr: Relax [. . .] Believe me no [one] knows my business [. . .] I just like what I see is that wrong

Bommarito: In a way, yes

Mohr: yes what

Bommarito: its wrong

Mohr: What is

Bommarito: crossing any boundaries

Mohr: Stop it [. . .] Come toward the men's room

8

| Bommarito: No lol . . im going outside [. . .] be good |
|---|

35.     Later that evening, Mohr sent additional texts to Bommarito, including "walk to the Chiefs car," "come on," "come outside," "meet me," and "show me something." In response, Bommarito told Mohr "no," and to "be good." Bommarito informed Mohr that she does not mind Mohr texting her, but that she wanted to be one of the "boys" at the Fire Department and could offer only a friendship. In response, Mohr again texted "come on, I won't say anything." Mohr texted Bommarito on multiple further occasions, stating "come on," "U will trust me," "I'll be ur friend," "[j]ust show me u once and wont bother u again," "ill like seeing what you look like," "one time," "Ur [no] fun."

36.     That whole evening, Bommarito rejected Mohr's advances.

37.     On or about July 4, 2015, the Fire Department hosted a Fireman's Carnival. After a parade, Bommarito, Mohr, and other firefighters rode back to the firehouse in the Chief's truck. During that ride, Mohr—who was sitting by Bommarito—put his arm around her.

38.     When Bommarito arrived at the firehouse, she went upstairs into the women's bathroom and changed out of her firefighter uniform. Mohr followed Bommarito upstairs, and upon her exit from the women's bathroom, Mohr—who was still dressed in his firefighter uniform—approached her and kissed her. Mohr did not say anything before this sexual advance. Bommarito agreed to get in her car with Mohr and they drove to a different location and kissed again.

39.     Four days after the incident following the Fireman's Carnival, Mohr again texted Bommarito, resulting in the following text exchange:

> Mohr:   I know u want it again just playing hard to get
>
> Bommarito:   maybe
>
> Mohr: you addicted already?   Lol
>
> Mohr:   Let me get it u wanted it too don't put it all on me

40.     Around the time of this exchange, Mohr and Bommarito had sex for the first time. For the next approximately two months, Mohr and Bommarito would regularly have sex. Mohr would also, on regular occasion, send Bommarito aggressive text messages demanding loyalty.

41.     For example, Mohr sent Bommarito the following messages:

> Mohr:   Are u gonna be committed to me
>
> Bommarito: yes
>
> Mohr:   I'm the only one your gonna fuck kiss whatever
>
> Bommarito: yes
>
> Mohr:   I'll hold you to that because I care about u
>
> Mohr: Has anyone else asked you those questions
>
> Bommarito: day by day
>
> Bommarito: no not really

42.     In an August 9, 2015, text message exchange, Bommarito and Mohr stated that they "love[d]" each other. Mohr added "U better not stop loving me."

43.     On one occasion, Mohr also told Bommarito, in sum and substance, that he may show naked pictures that he took of Bommarito to other members of the Fire Department.

44.     At the Fire Department, Mohr also held responsibilities relating to the maintenance of records that reflected which Fire Department firefighters had participated in "calls" to which the Fire Department had responded. While they were engaged in a relationship,

Mohr told Bommarito, in sum and substance, that he would "check her in" for calls that she did not go to (i.e., put false entries into the Fire Department's records), so that she would make a quota mandated by Fire Department policies.

45.    Mohr also claimed responsibility for Bommarito's successful enrollment in a Westchester County firefighting course.

***Bommarito Attempts to Terminate the Relationship, and Mohr Stalks and Harasses Her***

46.    In approximately mid-August 2015, Bommarito initiated efforts to terminate the relationship with Mohr. Bommarito told Mohr that she felt verbally and mentally abused by him.

47.    In the Fall of 2015, Bommarito stopped having sex with Mohr. In response, Mohr sent Bommarito numerous text messages, repeatedly called her, and repeatedly drove by her house.

48.    On one occasion, Bommarito and another junior firefighter went to a call with the fire engine's lights and sirens on. When they arrived back at the firehouse, Mohr accused Bommarito of violating a Fire Department policy by turning on the lights and sirens, and screamed at Bommarito in front of the other firefighters, calling her a "bitch" and a "whore."

49.    From October 2015 to January 2016, Mohr repeatedly followed Bommarito in her car and drove by her house. During this time, on multiple occasions, Mohr drove around the block where Bommarito lived, passing her house, more than once in a single day. On certain occasions, Mohr did so while driving a Fire Department official vehicle that was assigned to the Fire Department's Fire Chief. That vehicle has sirens and prominently states "FIRE CHIEF" on the front of the vehicle.

50.     During this same time period, Mohr drove past the house of a friend of Bommarito's, on instances when Mohr knew that Bommarito was in the house. Mohr circled in his car, parked it at the end of the street, and stared at Bommarito from within his vehicle.

### The Fire Department and Town Officials—Fully Aware of Mohr's Stalking and Harassment of Bommarito—Take No Action

51.     Soon after the incident at the firehouse where Mohr screamed at Bommarito and called her a "whore" and "bitch" in front of other firefighters, a Fire Department firefighter stated to the Fire Department's First Assistant Chief, in sum and substance, that he had to "put an end" to the Mohr-Bommarito relationship. In response, the First Assistant Chief told the firefighter that it was not "his business" to stop it.

52.     Another Fire Department firefighter raised concerns with the First Assistant Chief about Mohr and Bommarito and, in sum and substance, told the First Assistant Chief he was supposed to take care of the situation. In response, the First Assistant Chief stated, in sum and substance, "What can I do? He's the chief," in an apparent reference to Mohr's prior tenure as the Chief of the Fire Department.

53.     In late 2015, Bommarito complained to Fire Department leadership about Mohr's harassment. Specifically, Bommarito showed the First Assistant Chief and the Second Assistant Chief text messages sent to her by Mohr and photographs of Mohr following her. Bommarito asked them to take action. The Assistant Chief and Second Assistant Chief did not conduct any investigation or take any action against Mohr.

54.     On December 1, 2015, the Fire Department's members elected Mohr as Chief of the Fire Department.

55.     After the election, Bommarito complained to the Second Assistant Chief about Mohr's harassment of her. The Second Assistant Chief told Bommarito that the issue would be

handled and that every member of the Fire Department was going to have to take a sexual harassment class. Neither happened.

56.     In early December 2015, Bommarito received a call from Harrison's Personnel Manager, asking Bommarito to attend a meeting with Harrison's Mayor. However, when Bommarito arrived for the meeting, the Mayor did not participate. Instead, Bommarito met with the Personnel Manager and Harrison's attorney. During the meeting, the Personnel Manager and attorney informed Bommarito that they had heard reports that Mohr was harassing Bommarito. They informed Bommarito that there would be consequences for Mohr's actions.

57.     Following the meeting, Bommarito texted the Second Assistant Chief, telling him that she met with the Personnel Manager who had told Bommarito not to worry. In response, the Second Assistant Chief stated "I promise nothing will happen to you so if that's what's worrying you please don't." Bommarito texted back "I'll be fine. I believe you . . . I look up to you, I trust you."

58.     The Town's Mayor, Personnel Manager, and attorney did not take any employment action against Mohr in December 2015.

59.     On January 14, 2016, Mohr again used the official "Fire Chief" vehicle to follow Bommarito in her car. The next day, on January 15, 2016, Bommarito sent Mohr a direct message on the Facebook social media platform, stating "do not contact me… do not call me… do not text me… do not follow me when I am driving. I am tired of you harassing me. I've been asking you for the last two months to leave me the fuck alone."

60.     On or about January 17, 2016, Bommarito again discussed Mohr's actions with the First Assistant Chief and Second Assistant Chief. These individuals informed her, in sum and

substance, that if she obtained a restraining order against Mohr, Mohr would remain employed at the Fire Department while Bommarito would be required to leave her employment.

### *The Police Chief Coerces Bommarito Into Resigning from the Fire Department and Defendants Permit Mohr to Remain as a Fire Department Firefighter*

61.     On January 18, 2016, Bommarito went to the Harrison Police Department and filed a report against Mohr. Bommarito's written report detailed Mohr's initial advances, as well as her sexual relationship with Mohr. Among other things, Bommarito reported that Mohr repeatedly called her a "whore" and a "slut" and had repeatedly followed her in his vehicle. Bommarito turned over her two cell phones to the Harrison Police Department so that they could review those phones' contents. Those cell phones did not contain an exhaustive set of Bommarito's communications with Mohr, because Bommarito had, on certain occasions, deleted such communications from her phones. Bommarito did not affirmatively report to the police that she had ever made such deletions regarding communications with Mohr.

62.     The then-Harrison Police Chief, Anthony Marraccini, together with an assigned detective, investigated Bommarito's complaints. Marraccini spoke with Mohr. That interaction was captured by a recording. During that conversation, Marraccini told Mohr that "the Town would have enough to move forward on a sexual harassment" claim against Mohr. Marraccini stated that he "want[ed] to broker a deal with the Town to make sure this whole thing dies," and "figure out a way to schmooze it over." Mohr noted that Bommarito had "made a complaint" and "turned over a lot of documents." Marraccini told Mohr it was a "problem," and the "point is" to get Mohr "out of this whole situation." Marraccini also stated to Mohr that he "want[ed] to see this thing go away."

63.     In addition, Marraccini told Mohr that he had to meet with the Fire
Commissioners to address Bommarito's complaints. Marraccini explained to Mohr that he
planned to recommend to the Fire Commissioners that Bommarito leave the Fire Department.

64.     Marraccini also stated to Mohr that Bommarito's presence at the firehouse was a
"temptation," which was "hard to resist sometimes."

65.     During this interaction, Mohr raised with Marraccini the possibility that
Bommarito may file a lawsuit. In response, Marraccini stated, "she's not because I think that,
when I talk to her, I'm going to tell her that that's not the place for her. Because she wasn't
truthful about the other relationships she was having." Upon information and belief, Marraccini's
reference to "other relationships" was a reference to romantic relationships that Marraccini
believed that Bommarito had with other Fire Department firefighters or Police Department
employees. Upon information and belief, there are no policies maintained by Defendants that
prohibit Fire Department firefighters from maintaining romantic relationships in such scenarios.

66.     Marraccini also drafted a resignation letter on behalf of Mohr that provided a
pretext for Mohr's resignation as Fire Chief, but would permit Mohr to remain a member of the
Fire Department as a firefighter. The letter stated that the reason for Mohr's resignation was
unforeseen health issues in Mohr's family. In discussing the resignation, the Police Chief
explained to Mohr that he did not "want to see you be hurt more than things have already been
hurt for you . . . you've got the perfect 'out' of this thing. Your mom's not well. You've got to
work on your home life." Mohr agreed with Marraccini, noting that he did not want to be
"suspended" despite there being "no good reason for" the resignation as Fire Chief.

67.     After speaking with Mohr, Marraccini met with Bommarito on January 22, 2016.
As also captured on video, Marraccini suggested that he could arrest Bommarito for her

15

supposed presentation of incomplete and false information to the Police Department regarding

her relationship with Mohr. Marraccini also noted Bommarito's sexual relationships with other

Harrison employees. Marraccini told Bommarito that he would report these two supposed facts

to the Fire Commissioners unless Bommarito resigned. Marraccini stated to Bommarito, "If I

report this to the . . . Commission [i.e., the Fire District's Board of Commissioners], which I'm

supposed to do tonight, because I have to report it to—about [Mohr], I have to report about you,

I have to report about the other firemen. I got a problem. You got a problem on your hand . . .

Could I put you under arrest? Maybe. . . My suggestion? It's simple. Tonight's the Fire

Commissioners' meeting. If you resign from the Fire Department, there's probably no reason for

me to tell them any of this stuff. Do you understand that?"

68.     Bommarito cried throughout this meeting with the Police Chief. Although

Marraccini stated that the resignation decision was Bommarito's to make, he also prepared a

resignation letter on Bommarito's behalf.

69.     At one point, for several minutes, Bommarito snapped a rubberband against her

wrist. The assigned Town police detective asked Bommarito if the snapping hurt, and

Bommarito explained: "I used to cut myself when I was younger. So I [was taught] to like take a

rubberband, slap it on my wrist." Shortly after providing that explanation, Marraccini read his

proposed resignation letter to Bommarito. She signed it.

70.     Shortly after signing the letter, Bommarito attempted to withdraw her resignation.

71.     On or about February 2, 2016, Bommarito called the Fire Department's President

and asked to withdraw her resignation, and spoke with other Fire Department firefighters who

understood that Bommarito had rescinded her resignation. Despite these efforts, the President of

the Fire Department called Bommarito later that day to inform her that the Police Chief

nevertheless provided Bommarito's resignation letter to the Mayor, who had approved it. During

a Fire Department meeting that night, the Fire Department's leadership—knowing that

Bommarito wished to rescind the resignation— accepted her resignation.

72.     In a subsequent phone call with Mohr, Marraccini told Mohr that he had spoken

with Harrison's attorney and the Mayor, and "they have given me their word that if you resign

[as Chief] … there's not going to be any repercussions from the Town Board, whether it's at

your [Department of Public Works] job or the firehouse. Um, they also did say that, you know, if

anything happens from this day forward, you're on your own."

***Mohr Continued to Harass Bommarito and Is Ultimately Arrested for His Harassment of
Bommarito***

73.     Following Bommarito's departure from the Fire Department, Mohr continued to

harass and stalk Bommarito. Mohr called her numerous times from blocked phone numbers and

continued to follow her in his vehicle. In April and May 2016, Bommarito again reported the

harassment to the Police Department and continued to provide further information to the police

detective assigned to the case.

74.     On or about May 3, 2016, Mohr was arrested for his harassment of Bommarito.

On or about July 19, 2016, Mohr pled guilty to harassment in the second degree, in violation of

New York Penal Law 240.26.03. On or about July 19, 2016, a family court judge entered an

order of protection against Mohr on behalf of Bommarito, mandating that Mohr stay away from

Bommarito.

75.     Despite pleading guilty to harassment and being the subject of an order of

protection, Mohr has remained a firefighter at the Fire Department.

76.     In or around December 2017, Mohr was again elected Chief of the Fire

Department but the Board of Fire Commissioners rejected his election.

77.     In or around December 2020, Mohr was elected as Second Assistant Chief. The Board of Fire Commissioners did not reject this election, and Mohr has served as Second Assistant Chief through 2022.

### *The Culture of the Fire Department*

78.     While a firefighter at the Fire Department, Bommarito was subjected to differential treatment because of her gender.

79.     For example, while the Fire Department offers showers and dorms for men, there are no such facilities for female firefighters.

80.     In the one bathroom reserved for women, Bommarito discovered pornographic magazines stored under the sink while looking for toilet paper.

81.     On numerous occasions, male firefighters made comments about women's bodies in front of Bommarito—discussing dancers' bodies at a strip club on one occasion and remarking on the breasts and buttocks of a passing jogger on another occasion. In other instances while Bommarito was present, male firefighters would show each other sexually suggestive photographs of women.

82.     When Bommarito was not around the fire house, Mohr would use derogatory language to refer to Bommarito in the presence of other male firefighters, including the Second Assistant Chief and the former Chief. Mohr told other firefighters that Bommarito was a "whore" and a "cunt." Mohr also used the phrase "oral skills" when discussing Bommarito in front of other firefighters, in an apparent reference to oral sex. In front of other male firefighters, Mohr also stated, in sum and substance, that "she wants it … she's looking for it," in a reference to Bommarito.

83.     Other Fire Department firefighters commented on Bommarito's body and the clothing that she chose to wear. For example, Bommarito heard from other Fire Department firefighters that Fire Department firefighters had discussed spandex and a sweater she wore, as well as the visibility of her breast while wearing that sweater.

84.      In front of Bommarito, other Fire Department firefighters discussed how Bommarito was "fucking" Mohr.

## FIRST CLAIM FOR RELIEF
42 U.S.C. § 2000e-2(a)(1)
Disparate Treatment Discrimination

85.     The allegations in paragraphs 1 through 85 are repeated and realleged as though set forth fully herein.

86.     Defendants violated 42 U.S.C. § 2000e-2(a)(1) by discriminating against Bommarito on the basis of sex when they coerced her resignation and refused to allow her to withdraw her resignation, resulting in a constructive discharge.

87.     Defendants also subjected Bommarito to intolerable working conditions because of her sex that would have induced a reasonable person to quit.

88.     Defendants had no legitimate nondiscriminatory reason to discharge Bommarito's employment. Even if the Defendants had such a reason, there is sufficient evidence establishing that any stated reason by Defendants is pretext to cover up their discrimination.

89.     As a direct and proximate cause of Defendants' disparate treatment and constructive discharge of Bommarito, Bommarito has suffered damages including but not limited to monetary damages, emotional distress, and loss of enjoyment of life.

**SECOND CLAIM FOR RELIEF**
42 U.S.C. § 2000e-2(a)(1)
Hostile Work Environment—Sex

90.     The allegations in paragraphs 1 through 90 are repeated and realleged as though set forth fully herein.

91.     Defendants violated 42 U.S.C. § 2000e-2(a)(1) by subjecting Bommarito to discrimination on the basis of her sex by creating and/or maintaining a hostile work environment that adversely affected the terms, conditions, and privileges of Bommarito's employment, and failing or refusing to take appropriate action to remedy the effects of the discriminatory treatment.

92.     The harassment was severe and pervasive, materially altered Bommarito's working conditions, created an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive, and/or created a work environment that Bommarito perceived to be hostile or abusive, and which adversely affected the terms, conditions, and privileges of her employment.

93.     Defendants failed to exercise reasonable care to prevent and promptly correct the sexually harassing behavior of Mohr.

94.     As a direct and proximate cause of the hostile work environment that Defendants subjected Bommarito to, she has suffered damages including but not limited to emotional distress and loss of enjoyment of life.

**THIRD CLAIM FOR RELIEF**
42 U.S.C. § 2000e-3(a)
Retaliation

95.     The allegations in paragraphs 1 through 95 are re-alleged as though set forth fully

herein.

96.     Defendants violated 42 U.S.C. § 2000e-3(a) by retaliating against Bommarito.

97.     As a result of Bommarito's complaints, Defendants constructively terminated

Bommarito when they coerced her into resigning and ignored her subsequent attempt to

withdraw her resignation from the Fire Department.

98.     A causal connection exists between Bommarito engaging in protected activity and

Defendants' termination of her employment as a firefighter.

99.     Defendants have no legitimate nondiscriminatory reason for the adverse actions

taken to coerce Bommarito's resignation. Even if Defendants had such a reason, there is

sufficient evidence establishing that Defendants' stated reason is pretext to cover up their

retaliation.

100.    Bommarito has suffered emotional distress, pain and suffering, inconvenience,

loss of enjoyment of life, humiliation, and other non-pecuniary damages as a result of

Defendants' retaliatory acts.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court grant the following

relief:

a.      Enjoin Defendants from subjecting employees to discrimination based on sex;

b.      Enjoin Defendants from failing to take appropriate action in response to employee

complaints of sexual harassment and discrimination;

21

c.     Order Defendants to develop and implement appropriate and effective policies, practices, and programs designed to prevent and correct promptly any sexual harassment from occurring in the Fire Department;

d.     Order Defendants to develop and implement policies, practices, and programs to report, investigate, and effectively address complaints about sexually harassing behavior in Harrison and the Fire District;

e.     Order Defendants to develop and implement appropriate and effective measures to prevent retaliation, including but not limited to: (1) instituting effective anti-retaliation policies and procedures; (2) distributing its anti-retaliation policies to all employees; (3) implementing appropriate anti-retaliation training to all employees and officials; (4) providing mandatory anti-retaliation training for all supervisors and employees;

f.     Order Defendants to provide sufficient remedial relief to Bommarito to make her whole for the losses she has suffered as a result of the sexual harassment, discrimination, and retaliation alleged in this Complaint;

g.     Award compensatory damages to Bommarito to fully compensate her for the injuries caused by Defendants' discriminatory and retaliatory conduct, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; and

h.     Award such additional relief as justice may require, together with the United States' costs and disbursements in this action.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).


Dated: New York, New York                          Respectfully submitted,
      June 8, 2022


                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         *Attorney for the United States of America*


By:  /s/ Charles S. Jacob_____
          CHARLES S. JACOB
          NATASHA W. TELEANU
          Assistant United States Attorneys
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Tel. No. (212) 637-2725/2528
          Fax No. (212) 637-2786
          Email: charles.jacob@usdoj.gov
                  natasha.teleanu@usdoj.gov